*In re* ESTATE OF WILLIAM V. JACKSON III, Deceased (Louis G. Apostol, Cook County Public Adm'r, Petitioner-Appellee, v. William V. Jackson, Jr., and Cynthia R. Hill, Respondents-Appellants).

First District (1st Division)   No. 1—01—1438

Opinion filed October 15, 2002.

836

Law Office of Antone D. Shaw, of Richton Park, for appellants.

Patrick T. Murphy, Public Guardian, of Chicago (Jill Runk, of counsel), for appellee.

JUSTICE McNULTY delivered the opinion of the court:

To resolve this case we must interpret section 2—6.5 of the Probate Act of 1975 (755 ILCS 5/2—6.5 (West 1998)), which permits the probate court to reduce or eliminate a parent's share in the estate

of his or her child in certain circumstances. The Department of Children and Family Services (DCFS) took William Jackson III (William III) from the custody of his parents, William Jackson, Jr. (Jackson), and Cynthia Hill, in 1996. William III died in 1998. His estate's sole asset is a potential cause of action for wrongful death. The office of the Cook County public guardian (Guardian) petitioned for a declaration that Jackson and Hill had no right to receive any portion of the estate. After an evidentiary hearing the trial court granted the judgment the Guardian sought. Jackson and Hill appeal.

We hold that the statute requires the court to address the factors specified in the statute before reducing or eliminating a parent's share in the child's estate. Because the record here does not show that the trial court considered those factors, we reverse the judgment and remand the case in part for further proceedings.

Hill gave birth to William III on June 5, 1996. In the last two weeks of July 1996, domestic disputes between Jackson and Hill led to six separate visits by police. None of the calls involved child abuse. Again in the early morning of July 31, 1996, a police officer came to the apartment in response to a call concerning a domestic dispute. The officer found Jackson's arm cut, Hill's face bruised, and William III in a messy bedroom wearing only a diaper. William III appeared healthy and showed no sign of injury. The officer arrested both Hill and Jackson and placed William III in the care of a neighbor. Police released Hill and Jackson later that morning and never charged them with any offense based on that or any other domestic incident. Neither Hill nor Jackson sought or received medical care for his or her injuries.

Vivian Church, from DCFS, came to the apartment that afternoon. Hill told Church that she and Jackson had been drinking before the fight. Both Hill and Jackson still smelled of alcohol when Church arrived. Jackson admitted that he had a chronic problem with alcohol. Church took William III into custody. Although she noted that the apartment was messy, she found that the condition did not warrant removal of the child from the parents' custody. Hospital records show that William III was then a healthy baby of just over 10 pounds, which put him in the twenty-fifth percentile for weight for children his age. He also fell into the twenty-fifth percentile for height and head size.

DCFS petitioned for custody of William III based on the parents' fights and alcohol abuse. Church did not tell Hill and Jackson where DCFS placed William III until the first court hearing on the petition for temporary custody. At the hearing the parties stipulated that William III was not in the room with Hill and Jackson during the fight, but he was in the apartment with them.

The court adjudged William III neglected. The court later entered

a disposition order making William III a ward of the court because both parents were "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor." Jackson's sister, Thelma Harmon, volunteered to take care of William III. DCFS placed William III in Harmon's care in December 1996.

Harmon's income decreased and she asked DCFS for financial assistance. DCFS did not help. At a hearing in May 1998 the court found that DCFS had not made reasonable efforts to comply with its own goals for the child because DCFS had not paid Harmon for the foster care.

In August 1998 a DCFS employee took William III to a hospital for developmental testing. The evaluator observed that William III "had dropped [from] 25% for wt, ht, [to] below 5%." At 26 months of age, William III weighed only 23½ pounds, which placed him under the fifth percentile for children his age. On September 2, 1998, DCFS removed William III from Harmon's care and placed him in the foster care of an unrelated family.

When William III arrived at the hospital five weeks later, on October 7, 1998, he weighed only 18½ pounds. Third degree burns covered his legs, and his back had sustained second degree burns. The hospital needed the consent of William III's custodian for necessary surgery. On October 14, 1998, a doctor noted, for the medical record:

> "Several attempts were made over the past 5 days to get in contact with The Department of Children and Family Services. The Consent for Surgery was faxed to DCFS on 10-14-98 and [was] not returned. Attempts to contact DCFS have been problematic. As this patient is in need of this surgical procedure, the plan remains to take the child on 10-15-98. Further attempts will be made to contact DCFS."

Despite the surgery and intensive care, William III suffered septic shock. He died on October 15, 1998, with Jackson and Hill at his side. The Guardian, after working to take William III from his family during his brief life, filed a petition for an "adjudication of parental neglect pursuant to § 2—6.5" of the Probate Act (755 ILCS 5/2—6.5 (West 1998)). The Guardian also petitioned for the appointment of the Cook County public administrator as administrator of William III's estate.

At the hearing on the petitions, Church testified that she had contact with Jackson and Hill exactly three times: once when she called Hill before coming to the apartment, a second time when she took William III into custody, and finally when she saw them in court at the temporary custody hearing. DCFS had not prepared an initial service plan by the time of the court hearing. Church did not give any

indication that she ever consulted Hill or Jackson about steps they would need to take to regain custody of William III.

The case manager for DCFS who prepared client service plans for Jackson and Hill admitted that she spoke to Hill or Jackson "maybe once or twice, if that much," in the course of her work as their case manager. Once, when she ran into Jackson at a court hearing, he asked what he needed to do to regain custody of William III. He also left messages on the case manager's voice mail seeking that information. The case manager admitted that she never gave either Hill or Jackson a copy of any service plans. She rated the parents' progress in services as unsatisfactory because they did not visit William III enough. She admitted that if they visited William III at his aunt's home without arranging the visit through DCFS, she would not know of the visit. She also rated Hill and Jackson unsatisfactory because they failed to comply with the service plans.

An attorney for the Guardian testified that she learned from Harmon that while William III was in Harmon's custody "Jackson often came over" to Harmon's home. She later testified that, according to the case manager's reports, when Harmon acted as William III's foster parent, "[t]he parents never visited. They never came forward and asked for visits." She admitted that case reports showed no incidents of domestic violence between Hill and Jackson following removal of William III from the custody of his parents.

Jackson testified that he tried to earn a living by salvaging old metal materials, like discarded car parts. Per week he earned "[a] couple of hundred dollars, if [he] could get it." He used a 1979 truck for his work. He recounted his efforts to track down William III after DCFS assumed custody. Because Jackson's truck was not then working, he and Hill applied for transportation assistance. DCFS approved the request and on October 12, 1996, about 10 weeks after taking William III from their home, DCFS sent Jackson and Hill one roll of tokens each.

Although Hill had considerable experience with DCFS, as DCFS had custody of several of Hill's children by other men, Jackson had no prior contact with DCFS. Once Jackson realized that DCFS meant to prevent him from regaining custody of William III, he asked his sister to be his son's foster mother. DCFS agreed to place William III in his aunt's care. Thereafter Jackson tried to contact his case manager, but DCFS personnel told him only that she was not available and she left no forwarding number. He went to see his son at his sister's home without making arrangements through DCFS.

When DCFS failed to give Harmon money to meet the needs of its ward, Harmon turned to Jackson. Jackson bought some clothes and

diapers for William III, but he admitted that he gave Harmon no money.

In 1998, around the time DCFS removed William III from Harmon's care, Jackson and Hill successfully completed parenting classes, an anger management workshop, and a domestic violence workshop. The court accepted the certificates of course completion into evidence.

The Guardian argued in closing that willful neglect and failure to support the child warranted elimination of benefits, without any consideration of the effect on the child. The attorney added:

"[T]hey may not have been the ones who tried to bathe William in that boiling water. However, Your Honor, but for the conduct of Cynthia Hill and William Jackson, the fighting, the drinking, the domestic violence, the years without doing services, without visiting, but for their heinous conduct, William would be alive today."

The attorney for Jackson and Hill emphasized that the court heard no evidence concerning any loss of opportunity, or any detriment to William III's quality of life, that resulted from their neglect or failure to support the child.

The court, without specifying any basis for its ruling and with no discussion of the evidence, concluded:

"These parents have neglected this child, and I am finding that they should not benefit because of the death of this child."

The court also appointed the Cook County public administrator as administrator of the estate. Jackson and Hill appeal from only the judgment eliminating their interest in their son's estate.

## ANALYSIS

■■ The trial court heard evidence, made a single finding of fact, and applied its interpretation of the Probate Act to reach a disposition. Where the trial court hears conflicting evidence, this court will not disturb the trial court's findings unless they are against the manifest weight of the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). But the trier of fact cannot disregard evidence that is uncontradicted, unimpeached and not inherently improbable. *Bazydlo*, 164 Ill. 2d at 215. The interpretation of a statute presents a question of law, subject to *de novo* review. *Petersen v. Wallach*, 198 Ill. 2d 439, 444 (2002).

■ In 1994, the General Assembly added a new section to the Probate Act to permit a court to reduce or eliminate a parent's share in the estate of his or her child. The section provides:

"A parent who, for a period of one year or more immediately before the death of the parent's minor or dependent child, has willfully neglected or failed to perform any duty of support owed to the minor or dependent child or who, for a period of one year or more,

has willfully deserted the minor or dependent child shall not receive any property, benefit, or other interest by reason of the death, *** unless and until a court of competent jurisdiction makes a determination as to the effect on the deceased minor or dependent child of the parent's neglect, failure to perform any duty of support owed to the minor or dependent child, or willful desertion of the minor or dependent child and allows a reduced benefit or other interest that the parent was to receive by virtue of the death of the minor or dependent child, as the interests of justice require. In no event shall the reduction of the benefit or other interest be less than the amount of child support owed to the minor or dependent child at the time of the death of the minor or dependent child. The court's considerations in determining the amount to be deducted from the parent's award shall include, but not be limited to:

(1) the deceased minor's or dependent child's loss of opportunity as a result of the parent's willful neglect, failure to perform any duty of support owed to the minor or dependent child, or willful desertion of the minor or dependent child;

(2) the effect of the parent's willful neglect, failure to perform any duty of support owed to the minor or dependent child, or willful desertion of the minor or dependent child on the deceased minor's or dependent child's overall quality of life; and

(3) the ability of the parent to avoid the willful neglect, failure to perform any duty of support owed to the minor or dependent child, or willful desertion of the minor or dependent child." 755 ILCS 5/2—6.5 (West 1998).

For the section to apply to any parent, the court must find one of three criteria met: the parent must have (1) willfully neglected the child, (2) failed to perform a duty of support owed to the child, or (3) willfully deserted the child. The Guardian argues on appeal, as in the trial court, that the court must read the statute as though a period, not a comma, followed the phrase "by reason of the death." That is, the Guardian told the trial court that the court must completely eliminate any recovery for any parent who meets any of the three listed criteria.

The statute cannot support the Guardian's construction. The General Assembly provided that a parent who meets any of the three criteria may not recover "until a court *** makes a determination as to the effect on the deceased minor" of the neglect, nonsupport or desertion. 755 ILCS 5/2—6.5 (West 1998). The Probate Act does not permit any reduction in the parent's share of the child's estate unless the parent meets one of the three criteria.

Once a court finds that the section applies, because the parent failed the child in one of the enumerated ways, the plain language of

the section requires the court to determine the effect on the child of the neglect, nonsupport or desertion. The section specifies that in determining the reduction from the parent's interest in the estate, the court's considerations "shall include" the child's loss of opportunity, the effect on the child's quality of life, and the ability of the parent to avoid the neglect, nonsupport or desertion. The use of "shall" in a statute usually indicates an intention to make the directive mandatory. *Andrews v. Foxworthy*, 71 Ill. 2d 13, 21 (1978).

> "In common and ordinary meaning the word ['shall'] has always a compulsory sense, though at times, upon sufficient reason, it may be construed as having only a permissive or directory meaning. Where the word is employed with reference to any right or benefit to anyone, and the right or benefit depends upon giving a mandatory meaning to the word, it cannot be given a permissive meaning, merely." *Clark v. Patterson*, 214 Ill. 533, 539 (1905).

See also *Andrews*, 71 Ill. 2d at 21. The statute here concerns a parent's right to a determination of the effect of parental misconduct on the child as part of proceedings to reduce or eliminate the parent's inheritance from his or her child's estate. The right depends upon construing "shall" here as mandatory. Thus, under *Clark* and *Andrews*, we must construe the Probate Act to require the court to consider the listed factors concerning the effect of parental misconduct on the child in any proceeding to reduce or eliminate the parent's share of the child's estate.

When a statute requires consideration of specific factors, even if the trial court need not make specific written findings on each factor, the record must indicate that the court considered the relevant factors. *In re Marriage of Fahy*, 208 Ill. App. 3d 677, 698 (1991). The record here does not indicate that the court considered any of the specified factors concerning the effect of parental misconduct on the child. The court's failure to consider the relevant factors, when viewed in conjunction with the Guardian's misconstruction of the statute, indicates that the trial court misinterpreted the statute.

When the trial court decides a case on the basis of a misapprehension of the law, this court generally should remand the case for retrial. *Tankersley v. Peabody Coal Co.*, 31 Ill. 2d 496, 504 (1964). But if all of the evidence so favors one party that no verdict against that party based on that evidence could ever stand, then this court should direct judgment in favor of that party. *Lesperance v. Wolff*, 79 Ill. App. 3d 136, 142 (1979). We find that the evidence here, viewed in its aspect most favorable to the Guardian's arguments, so favors Jackson that no verdict against him could stand.

A verdict reducing Jackson's share in his son's estate must have a

basis in one of the three statutory criteria for the statute's application to a parent. To interpret the terms of the three criteria, we look to the legislative history and the use of the terms in related statutes. *In re Application for Tax Deed*, 311 Ill. App. 3d 440, 444 (2000). Cases applying the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2000)) provide guidance for interpretation of the part of the Probate Act at issue here.

■ We need note only briefly the last two statutory criteria, which the trial court did not mention in ruling against Jackson. For willful desertion, the petitioner must prove that the parent's conduct indicated an intention to terminate custody of the child permanently. *In re Dawn H.*, 281 Ill. App. 3d 746, 757 (1996). The Guardian claims that the record shows that Jackson failed to visit his sister while she took care of William III. On the contrary, the record shows that Harmon told the Guardian that Jackson visited "often," and Jackson's testimony corroborated that evidence. The testimony of the Guardian's witnesses shows only that Jackson did not arrange his visits through DCFS, as the service plan required. The witnesses admitted that they would not know of visits not arranged through DCFS unless Harmon told them of the visits, as she did. In view of the difficulty doctors encountered when trying to contact DCFS in this case, Jackson's difficulty contacting DCFS to arrange visits with his son is unsurprising. Jackson's frequent visits, his requests for information about steps to take to regain custody, and the classes he took to qualify for regaining custody of his son all demonstrate that he did not intend to terminate custody permanently. See *In re Sanders*, 77 Ill. App. 3d 78, 83-84 (1979). Thus, the evidence cannot support a finding that Jackson willfully deserted his son.

■ The failure to perform any duty of support forms the second criterion for reducing or eliminating a parent's share in a child's estate. The legislative history shows that the General Assembly intended this provision to apply only when the parent failed to pay court-ordered support. During the discussion of the bill, Representative Wennlund specifically asked:

"[I]s that [duty of support] limited solely to somebody who is under a *** court ordered obligation to pay child support, or *** could it include any other duty of support, whatever that may be[?]" 88th Ill. Gen. Assem., House Proceedings, April 27, 1994, at 107.

The bill's sponsor, Representative von Bergen-Wessels, answered:

"[A] duty of support would be something that had been established by the court." 88th Ill. Gen. Assem., House Proceedings, April 27, 1994, at 108.

As no court ordered Jackson to pay any support, the court had no

basis for finding that Jackson met this criterion for reducing or eliminating his share or William III's estate.

■ The General Assembly allowed the trial court to consider failure to fulfill parental duties as grounds for reducing a parent's share in an estate under the broad category of "willful neglect." 755 ILCS 5/2—6.5 (West 1998). The term "neglect" has no fixed and measured meaning. *In re A.B.*, 308 Ill. App. 3d 227, 240 (1999). Actions that qualify as neglectful in one circumstance may not be neglectful in other circumstances, because different circumstances demand different kinds of care. *In re A.B.*, 308 Ill. App. 3d at 240-41. The Juvenile Court Act of 1987 defines a neglected child as one who lacks "proper or necessary support, education *** or medical or other remedial care *** or other care *** including adequate food, clothing and shelter, or *** whose environment is injurious to his or her welfare." 705 ILCS 405/2—3(1)(a), (1)(b) (West 2000). The Adoption Act defines a neglected child similarly. 750 ILCS 50/1(Q) (West 2000).

Illinois courts have emphasized that neglect embraces willful as well as unintentional disregard of duty. *In re A.B.*, 308 Ill. App. 3d at 240. The General Assembly specified that to justify reducing a parent's share in a child's estate, the petitioner must prove that the parent neglected the child "willfully." 755 ILCS 5/2—6.5 (West 1998). For a parent to act willfully, the parent must intentionally disregard a known duty, while consciously aware that his conduct is practically certain to harm the child. See *Bartolucci v. Falleti*, 382 Ill. 168, 174 (1943); *People v. Pratt*, 213 Ill. App. 3d 69, 75 (1991).

■ DCFS took William III from Jackson's custody because Jackson and Hill fought frequently in the two weeks prior to the loss of custody and because of the parents' problems with alcohol. But the Guardian presented no evidence that the parents fought near the child or that their fights ever directly endangered the child. The more violent fight that precipitated William III's removal from the home occurred when he was in a separate room, not near the fight. Although the home appeared messy, the DCFS investigator who saw the home on the day of the fight, a few hours after police released Jackson and Hill from custody, found that the mess did not qualify as the kind of injurious environment that would warrant taking the child. The Guardian also did not show that the alcohol abuse had led to any injury to the child. The record unequivocally shows that when DCFS took him from his parents' custody, William III was a healthy baby with no sign of injury, with his weight proportional to his height, both within normal range for a child his age. Nothing in the Guardian's evidence supports an inference that Jackson must have been consciously aware of any danger to his child arising from his conduct, and therefore, the

evidence cannot support a finding of willful neglect while Jackson had custody of William III.

To show willful neglect thereafter, DCFS relies on Jackson's failure to comply with service plans and his failure to provide financial support. But the Guardian presented no evidence that anyone ever gave Jackson or Hill a copy of the service plans. The witnesses did not testify that they ever informed Jackson of the plans' requirements. The evidence cannot support a finding that Jackson willfully failed to comply with the service plans, even under the debatable assumption that a court could consider willful failure to comply with service plans as evidence of willful neglect. Moreover, Jackson completed a number of requisite classes in the months before William III's death.

Jackson presented uncontested evidence that he had very little income, so that the failure to give money to Harmon does not appear willful. Jackson provided some support in clothing and diapers when he visited Harmon. The support, while minimal, indicates that Jackson did not willfully neglect his son's needs. See *In re Estate of Teaschenko*, 393 Pa. Super. 355, 574 A.2d 649 (1990).

We hold that the totality of the evidence, considered in the light most favorable to the Guardian's arguments, cannot support a finding that Jackson willfully neglected William III. We reverse that part of the judgment that reduced Jackson's share in his son's estate.

■ The evidence against Hill appears somewhat stronger, because her prior contacts with DCFS may indicate a pattern of neglecting her children, and because she did not visit William III at Harmon's home as frequently as did Jackson. But the record fails to show that the trial court weighed any of the mandatory considerations before reducing her share in her son's estate. Therefore, we reverse the judgment of the trial court regarding Hill and remand for retrial as to her only.

On remand, the trial court will need to assess whether the statute applies at all, and to make that determination the court will need to interpret the three criteria for application of the statute. The court in *Teaschenko*, 393 Pa. Super 355, 574 A.2d 649, interpreted the language of a Pennsylvania statute that is strikingly similar to the Illinois statute in the phrasing of the three criteria for applicability of the statute. The sponsor of the bill in Illinois specifically mentioned the parallel. See 88th Ill. Gen. Assem., House Proceedings, April 27, 1994, at 108 (statements of Representative von Bergen-Wessels). We advise the trial court to consult the decision in *Teaschenko* for guidance on interpretation of the three criteria.

In deciding whether and to what extent to reduce Hill's share, the court must determine the effect of Hill's shortcomings on William III's "overall quality of life." 755 ILCS 5/2—6.5(2) (West 1998). To make

this determination the court must project the quality of the life the child would have had if Hill had not neglected, deserted, or failed to support him. But because Hill lost custody of William III, the principal effect on the child's quality of life is the change from her custody to the custody of DCFS. The law holds tortfeasors responsible for causing only the "natural and probable result[s] of the *** breach of duty." *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 738 (1996). We believe that the concept of cause stretches no further in the context of this case.

Reasonable persons should not foresee that DCFS will place children in unqualified foster homes or that qualified foster homes will starve and scald children in their care. The unforeseeable negligence of either party breaks the causal chain from Hill's acts to the child's sufferings. See *Ray v. Cock Robin, Inc.*, 57 Ill. 2d 19, 23 (1974). In the final placement outside of William III's family, William III lost 5 pounds, more than 20% of his total weight, in a scant 5 weeks. The foster parent then brought William III to the hospital with second and third degree burns covering much of his body. Contrary to the Guardian's argument, Hill bears no legal fault for these results. The court must compare the quality of life William III would have had if his mother had not neglected, deserted, or failed to support him with the quality of life he would have had if DCFS had provided him the kind of care one could expect from an approved foster home.

The Guardian failed to prove that Jackson met any of the statute's three criteria for reducing or eliminating a parent's share in his child's estate. The judgment regarding Jackson is reversed. The record on appeal does not show that the trial court weighed statutorily mandated considerations for reduction or elimination of Hill's share in her son's estate. Therefore the judgment against Hill is reversed and the cause is remanded for further proceedings in accord with this opinion.

Reversed in part; reversed and remanded in part.

GORDON, P.J., and COUSINS, J., concur.