*In re* A.B. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. C.B., Respondent-Appellant).

Second District   No. 2—98—1575

Opinion filed October 19, 1999.

230

Elliott A. Pinsel, of Daniels, Mauro & Pinsel, of Waukegan, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RAPP delivered the opinion of the court:
Respondent, C.B., appeals from separate orders entered in the

circuit court of Lake County terminating her parental rights to her five children. She contends (1) the trial court erred in finding her to be an unfit parent under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West Supp. 1997)); (2) the trial court improperly admitted and considered certain documents and related testimony; and (3) the termination of her parental rights is not in the best interests of the children. Respondent's ex-husband, Norman, is not a party to this appeal, having previously surrendered his parental rights to all five children. We affirm.

## I. FACTUAL BACKGROUND

In June 1997, the State filed separate petitions for termination of respondent's parental rights as to each of her five children. The petitions were identical, alleging unfitness due to (1) abandonment (750 ILCS 50/1(D)(a) (West 1996)); (2) the failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 1996)); (3) the desertion of the children for more than three months prior to the commencement of adoption proceedings (750 ILCS 50/1(D)(c) (West 1996)); (4) substantial neglect (750 ILCS 50/1(D)(d) (West 1996)); (5) the failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children or to make reasonable progress toward the return of the children within 12 months after they were adjudicated neglected (750 ILCS 50/1(D)(m) (West 1996)); and (6) the failure for a period of 12 months to (i) visit the children, (ii) communicate with the children or the agency, although able to do so and not prevented from doing so by an agency or by court order, or (iii) maintain contact with or plan for the future of the children although physically able to do so (750 ILCS 50/1(D)(n) (West 1996)). Therefore, the petition alleged, it was in the best interests of the children that respondent's parental rights be terminated and that DCFS be given the authority to consent to adoption. Hearings on the petitions were held beginning May 27, 1998.

Prior to testimony being offered at the unfitness hearing, the State asked the trial court to take judicial notice of the entire underlying court file, which contained the original adjudicatory petitions and orders, numerous agency reports, letters, and other documents pertaining to the case. Over respondent's hearsay objection, the trial court granted the request.

Diane Roche, an employee of Arden Shore Children and Family Services (Arden Shore), told the trial court that she was the supervisor of clinical services in charge of the foster care program. In March 1995, Roche was the direct supervisor of Janet Sterling, the caseworker assigned to the B. children.

Roche identified part of a client service plan prepared by Ms. Sterling for C.B. and the B. children in March 1995. Client service plans are prepared in each case and evaluated every six months at administrative case reviews (ACRs), at which time new plans are developed. It is a requirement that parents be given a copy of each plan in order to adequately inform them what they have to accomplish. Roche testified that client service plans are prepared in the ordinary course of the agency's business and are made contemporaneously with the events recorded. After establishing this, the prosecutor said, "Your Honor, at this point, before even asking any specifics as to this—the tasks and objectives of this plan, the State would ask to admit that part of the [client service plan] into evidence." Over respondent's objection that it did not qualify as a business record, the trial court admitted the service plan into evidence pursuant to section 115—5 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/115—5 (West 1996)). Roche was then permitted to testify regarding specifics of the service plans. This pattern was repeated with numerous other service plans.

Respondent testified on her own behalf. It was her belief that the children were initially removed from the home due to neglect by her husband. She claimed that she never admitted to the neglect petitions. (The record reveals otherwise, at least as to failing to provide proper or necessary support, education, or medical care.) Contrary to earlier testimony, respondent maintained that she attended each twice-a-week visit scheduled in 1995. She claimed to have called Lynn Sweeney to set up each visit in advance. According to respondent, there were times when she would show up for a visit only to have her caseworker and the children be no-shows. She stated that none of the cancellations were her fault and "that there were different excuses every time." Respondent testified that she started parenting classes but did not complete them at the time because she had to meet her ride in an unsafe neighborhood. She did, however, complete her domestic violence counseling. Respondent claimed to be in regular contact with her caseworkers, even though they switched constantly.

According to respondent, from 1994 through 1996, the children were placed with their paternal grandmother. (The record reveals otherwise.) Respondent testified that she contacted the children three or four times per week by phone during this time. However, respondent alleged she was prohibited from sending gifts to the children and was instead required to bring any gifts to visitation meetings. According to respondent, she made efforts to get the required psychological evaluations, but she was initially unsuccessful.

In February 1994 and August 1994, respondent obtained emer-

gency orders of protection against Norman because of his violence toward her. A plenary order of protection was issued October 21, 1994, and remained in effect until October 21, 1996. During the time the order was in effect, respondent alleged that Norman often showed up at her residence during the night, beat on the door, and threatened to kill her. The only time Norman left respondent alone was when he was in jail. Respondent filed a petition for dissolution of marriage in July 1997.

Respondent told the trial court that she moved to a two-bedroom apartment in Crystal Lake in late 1995 and was waiting for a three-bedroom apartment to become available "because [she] was fighting for custody of [her] kids." Respondent regularly advised her caseworkers of her whereabouts and testified that she consistently tested negative for drugs. She also notified her caseworkers about her situation with Norman. At one point respondent requested that she have court dates separate from Norman because of her fear of him. The request was denied.

In March 1996, respondent moved to Alabama because Norman had gotten out of jail and was threatening her again. Every time she moved to a different city in Illinois, Norman would find her. Respondent's entire family, except her children, lived in Alabama. Once in Alabama, respondent found a job as a machinist and began the process of buying land and a trailer so that she would have a place for her and her children to live. Respondent claimed to have attempted to contact her caseworker to arrange for visitation with her children when she returned for court dates. Her attempts were allegedly unsuccessful partly due to the failure of either DCFS or Catholic Charities to inform her of a change in caseworkers. Respondent claimed to have traveled to Illinois from Alabama at least two times to attend court, but she did not see her children either time. While in Alabama, respondent claimed that she communicated with her children by telephone once a weekend. However, she was prohibited from sending them cards or gifts. She attempted to find parenting classes in Alabama but was unsuccessful.

Respondent returned to Illinois in June 1997 "to fight for [her] children." When she arrived in court shortly thereafter, she was arrested and ordered to serve a six-month jail sentence on a rule to show cause because she had missed earlier court dates and not completed tasks ordered by the court. After her release from jail, respondent found employment and took up residence in a hotel. Respondent did not go back to Alabama "because [she] didn't want to go back to jail." Within months, respondent had rented a studio apartment, completed parenting classes, and undergone counseling and a mental health

evaluation. Respondent was in weekly contact with her caseworker, Libby Lee.

At the conclusion of the hearing, the trial court held that the State proved by clear and convincing evidence that respondent was unfit. In rendering its decision, the trial court relied on the "testimony and all of the reports and information in 94 J 729 [the underlying neglect file]," citing numerous letters, reports, and ACR summaries contained in the file.

The trial court subsequently ruled that it was in the children's best interests that C.B.'s parental rights be terminated. Respondent's posttrial motion was heard and denied. A notice of appeal was subsequently filed.

## II. ANALYSIS

### A. Admissibility of Client Service Plans and Related Testimony Under the Business Records Exception

■ Respondent argues that reversal is warranted because the trial court improperly admitted and considered the client service plans under the business records exception to the hearsay rule and improperly permitted extensive testimony regarding the specifics of the plans. The admission of such evidence generally falls within the sound discretion of the trial court. *In re V.T.*, 306 Ill. App. 3d 817, 819 (1999). However, this court has recognized that a trial court's determination that a particular statement is or is not hearsay (either under the common law or pursuant to statute) is a question of law because it does not involve the exercise of discretion, fact finding, or credibility assessments. *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 891 (1995). Only after a trial court has made the legal determination that a particular statement is or is not hearsay is it vested with the discretion to admit or bar the evidence (see *Halleck*, 269 Ill. App. 3d at 891) based upon relevancy, prejudice, or other legally appropriate grounds. A trial court's exercise of discretion is subject to an abuse of discretion standard of review. *In re V.T.*, 306 Ill. App. 3d at 819. On the other hand, questions of law are subject to a *de novo* standard of review. See *Halleck*, 269 Ill. App. 3d at 891.

■ Except in delinquency proceedings when a minor's liberty is at stake, proceedings under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1—1 *et seq.* (West 1996)) employ the general rules of civil practice and the provisions of the Code of Civil Procedure (735 ILCS 5/1—101 *et seq.* (West 1996)) unless the Juvenile Court Act specifically governs the procedure at issue. *In re Darnell J.*, 196 Ill. App. 3d 510, 513 (1990); see *In re W.C.*, 167 Ill. 2d 307, 320-22 (1995). The Juvenile Court Act specifically provides for the admission of busi-

ness records into evidence so long as statutory foundational requirements are met. 705 ILCS 405/2—18(4)(a) (West 1996). Therefore, neither section 115—5 of the Code of Criminal Procedure (725 ILCS 5/115—5 (West 1996)) nor Supreme Court Rule 236 (145 Ill. 2d R. 236) (providing for the admission of business records in civil cases) is applicable in this matter. See generally *People v. Sapyta*, 235 Ill. App. 3d 1007 (1992). In this case, the trial court improperly determined that the client service plans were business records pursuant to section 115—5 of the Code of Criminal Procedure. Contrary to respondent's belief however, the trial court's mistake as to the applicable statute does not mandate reversal.

██ Under section 2—18(4)(a) of the Juvenile Court Act:

"Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. *** All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/ 2—18(4)(a) (West 1996).

This provision is a variation of the common-law "business records" exception to the hearsay rule. Business records are considered reliable, and thus admissible, because of the regular, prompt, and systematic manner in which they are kept and the fact that they are relied upon in the operation of the business. *In re N.W.*, 293 Ill. App. 3d 794, 798 (1997). For a writing to be admissible as a business record under section 2—18(4)(a), the proponent must establish a foundation showing that the writing was (1) made as a memorandum or record of the event, (2) made in the ordinary course of business, and (3) made at the time of the event or within a reasonable time thereafter. *In re V.T.*, 306 Ill. App. 3d at 820. The author of the writing need not testify or be shown to be unavailable; anyone familiar with the business and its procedures may testify about how the writing was prepared. *In re V.T.*, 306 Ill. App. 3d at 820. The record in this case reveals that, as a matter of law, the trial court properly determined an adequate foundation was established for the admission of the client service plans into evidence as business records. Each witness testified that the plans were

prepared in the regular course of business and were made contemporaneously with the events they purported to record.

■ Respondent, nonetheless, urges us to find that the client service plans were inadmissible because they were prepared in anticipation of litigation. Records prepared in anticipation of litigation are not records made in the regular course of business and thus are not admissible into evidence unless they fall within another exception to the hearsay rule. *Kelly v. HCI Heinz Construction Co.*, 282 Ill. App. 3d 36, 41 (1996). A record is prepared in anticipation of litigation if it is prepared with an eye toward pending or anticipated litigation of any kind. See *In re N.W.*, 293 Ill. App. 3d at 798.

■ As the State points out in its brief, client service plans are generally required to be submitted to the trial court for purposes of review in each case. See 705 ILCS 405/2—28 (West 1996). Indeed, DCFS and its contract agencies are required to "assist a Circuit Court during all stages of the court proceeding in accordance with the purposes of *** the Juvenile Court Act of 1987 by providing full, complete, and accurate information to the court and by appearing in court if requested by the court." 325 ILCS 5/8.3 (West 1996). Client service plans are prepared in the first instance with family preservation and the best interest of the child in mind, not with the goal of termination of parental rights. The acceptance or refusal of the services outlined in the service plan is voluntary. See 325 ILCS 5/8.1 (West 1996); 325 ILCS 5/8.2 (West Supp. 1997). Client service plans are required to be prepared by DCFS or one of its contract agencies in the regular course of the agency's business. They are not prepared in anticipation of adversarial litigation. Simply because they are used in an adversarial-type proceeding is of no consequence.

■ Respondent also objects to the trial court's permitting testimony regarding the specifics of the documents admitted. While we believe that the trial court erroneously allowed witnesses to testify to the specifics of the client service plans, we find that such error did not unduly prejudice respondent. Under the business records exception, whether pursuant to section 115—5 of the Code of Criminal Procedure, Supreme Court Rule 236, or section 2—18(4)(a) of the Juvenile Court Act, "it is the business record itself, not the testimony of a witness who makes reference to the record, which is admissible" (*Cole Taylor Bank v. Corrigan*, 230 Ill. App. 3d 122, 130 (1992)). In other words, "[a] witness is *** not permitted to testify as to the contents of the document or provide a summary thereof; the document 'speaks for itself.' [Citations.]" M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 825 (7th ed. 1999).

The State contends that section 2—18(4)(a) of the Juvenile Court

Act is immune from the requirement that writings speak for themselves based upon language contained in the statute that states, "All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/2—18(4)(a) (West 1996). We find this contention unpersuasive. Both section 115—5 of the Code of Criminal Procedure (see 725 ILCS 5/115—5(a) (West 1996)) and Supreme Court Rule 236 (145 Ill. 2d R. 236(a)) contain almost identical language, and yet a record admitted pursuant to either the statute or the rule still "speaks for itself" (M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 825 (7th ed. 1999)).

After the trial court admitted the client service plans into evidence, it permitted, over respondent's objection, lengthy testimony regarding their specific contents from witnesses who did not author the documents. The witnesses had secondhand knowledge, at best, of the events that led to the conclusions contained in the service plans. This procedure was error, but not reversible error. From a review of the record we fail to detect any prejudice suffered by respondent in allowing the witnesses to testify in such a manner. We believe the client service plans alone, without the aid of the supporting testimony, are sufficient to establish at least one ground of parental unfitness by clear and convincing evidence. See *In re M.S.*, 302 Ill. App. 3d 998, 1002 (1999) (holding that the State need prove only one ground of parental unfitness by clear and convincing evidence in a termination of parental rights case). Hence, the supporting testimony was mere surplusage.

## B. The Proper Scope of Judicial Notice

■ Respondent next argues that the trial court improperly took judicial notice of the underlying neglect file pertaining to conditions that led to the removal of her children. A court may take judicial notice of matters generally known to the court and not subject to reasonable dispute. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 201.1, at 56 (7th ed. 1999). This includes matters of record in its own proceedings. *In re J.G.*, 298 Ill. App. 3d 617, 627 (1998). However, taking judicial notice of matters of record in a court's own proceedings cannot result in admitting hearsay evidence where it would otherwise be prohibited. See *In re J.G.*, 298 Ill. App. 3d at 628-29. This rule has been recently codified for juvenile proceedings and was in effect at the time of the proceedings in this case. Section 2—18(6) of the Juvenile Court Act provides:

"In any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted in prior proceedings involving the same minor if (a) the parties were either represented by counsel at such prior proceedings or the right to counsel was knowingly waived and (b) the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited." 705 ILCS 405/2—18(6) (West 1998) (eff. August 16, 1997; see Pub. Act 90—608, § 30, eff. August 16, 1997 (changed from January 1, 1998, by Pub. Act 90—443, § 99, eff. August 16, 1997)).

In *In re J.G.*, 298 Ill. App. 3d 617, the State asked the trial court to take judicial notice of the court file at the commencement of the unfitness hearing. Respondent's counsel objected on the ground that much of the information contained in the file was hearsay and therefore not admissible in a termination of parental rights hearing. The trial court overruled the objection because there had been court reviews of respondent's case every six months, and respondent was present for each hearing. Respondent was then found to be unfit, and her parental rights were terminated. Respondent appealed.

On appeal, the Appellate Court, Fourth District, held that taking wholesale judicial notice of all matters that happened prior to the unfitness hearing is "unnecessary and inappropriate." *In re J.G.*, 298 Ill. App. 3d at 629. Prior to reaching this conclusion, the court noted:

"In the typical termination of rights case, the file has been open for at least a year and, frequently, much longer. During that period, the trial court will have conducted any number of review hearings and DCFS will have filed various service plans and reports with the court. These materials serve a vital function at the review hearings in assisting the court in determining whether a child may be returned home and the case closed, or whether the parent has failed to progress to the point where reunification is appropriate. These reports may contain hearsay. ***

At an unfitness hearing, the trial court must necessarily take notice of certain facts relating to how the case has reached the point at which termination of parental rights is sought by the State. Thus, the court must know what steps the parent was supposed to have taken in order to achieve reunification with the child and when the clock began to run during which time the parent was required to take these steps." *In re J.G.*, 298 Ill. App. 3d at 628-29.

The court then suggested:

"If the State wishes the trial court to take judicial notice of portions of the court file in a particular unfitness proceeding, the State can make a proffer to the court of the material requested to be noticed. Defense counsel should then be allowed an opportunity to

object to the State's request. Such a procedure would serve to focus the trial court's attention on only those matters that are admissible under the rules of evidence, as well as make it easier for a reviewing court to determine what the trial court actually relied on in making its decision of unfitness. Above all, the trial court's decision as to whether a parent is unfit should be based only upon evidence properly admitted at the unfitness hearing." *In re J.G.*, 298 Ill. App. 3d at 629.

The court went on to hold that, regardless of the trial court's error in taking judicial notice of the entire court file, respondent was not prejudiced. There was more than sufficient evidence of respondent's unfitness properly admitted at the hearing to sustain the trial court's determination of unfitness. *In re J.G.*, 298 Ill. App. 3d at 629.

■ This case is very similar to *In re J.G.* At the outset of the hearings on the petitions to terminate respondent's parental rights, the State requested the trial court to take judicial notice of the underlying neglect file. The file contained the original adjudicatory petitions and orders, agency reports, various letters, and transcripts of previous court proceedings pertaining to the case. Over respondent's objection that the material was hearsay that would be inadmissible during termination-of-parental-rights proceedings, the trial court granted the State's request and took judicial notice of the entire underlying neglect file. In rendering its decision at the conclusion of the hearing on parental unfitness, the trial court relied on "testimony and all of the reports and information in 94 J 729 [the underlying neglect file]."

Like the court in *In re J.G.*, we feel the better practice in this case would have been for the trial court to require the State to make a proffer of the items of which it wished the court to take notice. However, respondent has failed to establish in her brief how she was prejudiced by the trial court's error, and we find no evidence in the record to support a finding of prejudice. We believe that other evidence was sufficient to establish at least one ground of parental unfitness by clear and convincing evidence. See *In re M.S.*, 302 Ill. App. 3d at 1002.

### C. Determination of Parental Unfitness

■ Respondent next contends that she was not proved unfit by clear and convincing evidence. The Juvenile Court Act provides a two-stage mechanism whereby parental rights may be involuntarily terminated. 705 ILCS 405/2—29(2) (West 1996). Under this bifurcated procedure there must be a threshold showing of parental unfitness based upon clear and convincing evidence and then a subsequent showing that the best interests of the child are served by severing parental rights. See *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990).

■ Parental unfitness is determined with reference to section

1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1996)). 705 ILCS 405/2—29(2) (West 1996). Because parents have superior rights against all others to raise their children (see *In re T.D.*, 268 Ill. App. 3d 239, 245 (1994)), before a trial court can adjudicate a parent unfit and terminate parental rights, the State must prove by clear and convincing evidence at least one statutory ground of parental unfitness. *In re M.S.*, 302 Ill. App. 3d at 1002. This means that, on review, if there is sufficient evidence to satisfy any one statutory ground we need not consider other findings of parental unfitness by the trial court. *In re M.S.*, 302 Ill. App. 3d at 1002. However, we must review the facts of each termination-of-parental-rights case with close scrutiny. *In re M.W.*, 199 Ill. App. 3d 1050, 1052-53 (1990). The reason for this is that the "[t]ermination of parental rights is as drastic and permanent an action as can be taken." *Blakey v. Blakey*, 72 Ill. App. 3d 946, 947 (1979). In a review of a termination-of-parental-rights case, factual comparisons to other cases are inappropriate, based on the reality that each case is *sui generis*, *i.e.*, peculiar unto itself. *In re M.S.*, 302 Ill. App. 3d at 1002.

██ A trial court's determination of parental unfitness involves factual findings and credibility assessments that the court is in the best position to make. *In re M.S.*, 302 Ill. App. 3d at 1002. We therefore defer to the trial court's disposition, particularly where evidence is in conflict. We will not substitute our judgment for that of the trial court. *In re M.S.*, 302 Ill. App. 3d at 1002. Our standard of review is appropriately stringent—we will uphold the trial court unless its decision is against the manifest weight of the evidence. *Syck*, 138 Ill. 2d at 274; *In re M.S.*, 302 Ill. App. 3d at 1002. A determination is said to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident, or the determination is unreasonable, arbitrary, and not based on the evidence presented. *Brazas v. Ramsey*, 291 Ill. App. 3d 104, 109 (1997).

Respondent maintains that the trial court's determination of her parental unfitness was erroneous. Due to the standard of review we must apply and the fact that there need be only sufficient evidence to satisfy any one statutory ground, we disagree.

██ Section 1(D)(d) of the Adoption Act provides that a person may be declared an unfit parent based upon "[s]ubstantial neglect of the child if continuous or repeated." 750 ILCS 50/1(D)(d) (West 1996). Our supreme court said long ago, "Neglect *** is the failure to exercise the care that the circumstances justly demand. It embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from the specific circumstances, and its meaning varies as the context of surrounding cir-

cumstances changes." *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952). That definition still holds true today.

Section 2—3(1) of the Juvenile Court Act also defines a neglected child as including:

> "(a) any minor under 18 years of age who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parents or other person responsible for the minor's welfare ***; or
>
> (b) any minor under 18 years of age whose environment is injurious to his or her welfare[.]" 705 ILCS 405/2—3(1)(a), (b) (West 1996).

Section 1(Q) of the Adoption Act states:

> " 'Neglected Child' means any child whose parent or other person responsible for the child's welfare withholds or denies nourishment or medically indicated treatment including food or care denied solely on the basis of the present or anticipated mental or physical impairment as determined by a physician acting alone or in consultation with other physicians or otherwise does not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare." 750 ILCS 50/1(Q) (West Supp. 1997).

■ It is insufficient to find a parent unfit based upon neglect alone or an isolated incident of neglect. Instead, the neglect must be both "substantial" and "continuous or repeated." See 750 ILCS 50/1(D)(d) (West Supp. 1997). An action is substantial when it is carried out "to a large degree." Webster's Third New International Dictionary 2280 (1993). It follows, then, that for a finding of unfitness under section 1(D)(d) of the Adoption Act, neglect of the child must be pronounced over a period of time or there must be multiple instances of pronounced neglect.

■ In this case, the State argues that respondent's act of leaving Illinois for Alabama amounts to substantial neglect. The State asserts that respondent exercised no care toward her children while she was in Alabama. We agree with the State. Respondent could not have provided proper or necessary support, education, or medical or other remedial care recognized under State law as necessary for a minor's well-being, including adequate food, clothing, and shelter. Not only does the record support the finding that respondent failed to provide

proper and necessary support, but also the trial court determined that respondent abandoned her children. Both statutory definitions cited above equate abandonment with neglect. The length of respondent's absence certainly could have convinced the trial court that the neglect was "substantial." We will not substitute our judgment for that of the trial court.

We cannot say that the opposite conclusion is clearly evident from the record or that the trial court's conclusion is unreasonable, arbitrary, and not based on the evidence presented. The trial court's finding of unfitness based upon substantial neglect was not against the manifest weight of the evidence.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

BOWMAN, P.J., and HUTCHINSON, J., concur.