2020 IL App (2d) 191052-U
No. 2-19-1052
Order filed April 21, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* D.E.Z., A.E., D.E., and T.E., Minors | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | Nos. 17-JA-334 |
| | ) | 17-JA-335 |
| | ) | 17-JA-336 |
| | ) | 17-JA-337 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. Elizabeth E., Respondent- | ) | Mary Linn Green, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Birkett and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The judgment terminating respondent's parental rights was affirmed where (1) the trial court's determination of unfitness was not against the manifest weight of the evidence; (2) respondent did not receive ineffective assistance of counsel; and (3) appellate court would not adopt *per se* rule requiring termination proceedings to be heard by a different judge than the one who presided over earlier proceedings.

¶ 2    Respondent, Elizabeth E., appeals from an order of the circuit court of Winnebago County finding that she is an unfit parent and that it was in the best interests of her minor children, D.E.Z., A.E., D.E., and T.E. that her parental rights be terminated. On appeal, respondent challenges the finding of unfitness. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Respondent is the biological mother of D.E.Z., A.E., D.E., and T.E., born July 18, 2007, October 23, 2010, February 25, 2012, and May 1, 2015, respectively. The parental rights of the fathers are not at issue in this appeal.

¶ 5     On October 24, 2017, the State filed neglect petitions with respect to all four minors. The petitions each alleged nine counts (with a tenth count in the petition regarding the youngest child T.E.). Namely, the petitions alleged that the minors were neglected based on an injurious environment, thereby placing them at risk of harm, in that (1) respondent failed to cure the conditions for which the minors were previously in the care of the Illinois Department of Children and Family Services (DCFS), (2) respondent had a history of domestic violence, (3) respondent told DCFS that it could take her children and that she did not want to deal with its investigation, (4) respondent had a substance abuse issue that prevented her from properly parenting, (5) respondent had a mental health issue that prevented her from properly parenting, (6) respondent struck D.E.Z. with an extension cord and struck D.E. with a belt; (7) respondent struck A.E.'s and T.E.'s siblings with an extension cord; (8) respondent used excessive corporal punishment against A.E.'s and T.E.'s siblings; and (9) respondent left T.E. in the care of Terrence J. (T.E.'s father) after alleging in a verified petition for order of protection against Terrence J. that Terrence J. is violent, had committed numerous domestic violence incidents, and had a history of battering respondent.

¶ 6     With respect to D.E.Z. and D.E., Counts VII and VIII alleged that they were abused minors in that respondent or other individual as identified in the statute inflicted, caused to be inflicted, or allowed to be inflicted upon such minors physical injury, other than by accidental means, which caused death, disfigurement, impairment of physical or emotional health, or loss or impairment of

any bodily function and inflicted corporal punishment by beating D.E.Z. with an extension cord and by beating D.E. with a belt. The tenth count with respect to T.E. alleged that T.E. was neglected based on an injurious environment, thereby placing her at risk of harm, in that Terrence J. had a history of domestic violence. Amended neglect petitions with respect to D.E.Z., A.E., and D.E. were filed on February 6, 2018; the petitions maintained the same counts.

¶ 7                          A. Shelter Care and Neglect Adjudication

¶ 8     On the day the initial neglect petitions were filed, the trial court held an arraignment on the neglect petitions, appointed counsel to represent respondent, and appointed a guardian *ad litem* (GAL) to represent the minor children. A shelter-care hearing on the neglect petitions was continued to November 17, 2017. At the shelter-care hearing, the State called Quinten Ponius, the DCFS investigator assigned to the case at the time. Ponius testified that on September 15, 2017, DCFS received a hotline call regarding suspected abuse of D.E. At the time, respondent had two pending cases with DCFS. Ponius testified that he observed "a mark on the right side of [D.E.'s] face" and that, in response to Ponius's inquiry as to how she was injured, D.E. stated that "she received a whoopin' because she could not find, um, one of her pajama, uh, the top of her pajama set." However, Ponius testified, D.E.'s older sister, D.E.Z., told Ponius that "when they went to school, [] [D.E.] did not have those marks on her face" and that D.E. "did not receive a whoopin' the night prior."

¶ 9     Ponius further testified that he spoke to personnel at the minors' school who stated injuries to D.E.'s face were seen but that no one at the school observed D.E. receive any injury to her face while D.E. was at school. Moreover, Ponius testified, respondent admitted to the use of corporal punishment but told Ponius that she did not use any object and did not hit D.E. in her face. Ponius

also testified that respondent stated that she had been diagnosed with a mental illness but that she was unwilling to sign a consent to determine if she was compliant with medication.

¶ 10    Ponius testified that DCFS received another hotline call on October 20, 2017, that D.E.Z. had been "hit with an extension cord." Ponius visited the minors' school and spoke to D.E.Z. and D.E. D.E. stated that D.E.Z. "had been hiding in the closet, and her mother dragged her out of the closet and hit her with an extension cord" because D.E.Z. had taken something from their youngest sister. D.E.Z. confirmed the account. Ponius observed bruising on D.E.Z.'s legs, which D.E.Z. stated were from being hit with the extension cord. Ponius also met with respondent that day and discussed a safety plan, which entailed either removal of the minors from the home or "someone com[ing] into the house, [], to monitor the supervision between her and the children" until DCFS obtained a drug test and medical records. Respondent was unwilling to comply with the safety plan and remained unwilling to sign a consent to release her medical records.

¶ 11    Respondent also testified at the shelter-care hearing. She testified that on the morning of the first hotline call, September 15, 2017, D.E. did not have a mark on her face. Respondent stated that she disciplined the minors by having them "go in the corner" and by "tak[ing] away things they like." She also stated that she did not discipline her children by striking them with her hand or with any objects. With respect to the second hotline call on October 20, 2017, respondent testified that Ponius visited her home again and requested that respondent sign a release so that he could verify her compliance with medication. According to respondent, Ponius requested that she "fill out personal papers that [she] felt [were] irrelevant, that [she] felt like [she] had the right to deny." On cross-examination, respondent testified that she had been diagnosed with schizophrenia; she was unsure when she was diagnosed but stated that "[i]t's been a long time." Respondent refused to answer questions with respect to the identity of her doctor. During a break in her cross-

examination, respondent left the courthouse. The trial court issued a rule to show cause why respondent should not be held in contempt for her conduct, finding that respondent "made a conscious decision to absent herself from the proceedings without any approval of doing so by the court."

¶ 12     On November 21, 2017, the trial court entered an order finding that: (1) there was probable cause to believe that the minors were abused/neglected; (2) DCFS made reasonable efforts to prevent or eliminate the need to remove the minors from the home; and (3) there was an urgent and immediate necessity to place the minors in shelter care pending further proceedings for their protection. The court placed temporary guardianship and custody of the minors with DCFS with discretion to place the minors with a responsible relative or in traditional foster care.

¶ 13     The adjudicatory hearing proceeded on February 6, 2018. The State offered into evidence the verified petition for order of protection filed by respondent against Terrence J. Respondent stipulated that the State could meet its burden on count IX of the neglect petition—that the minors were neglected based on an injurious environment, thereby placing them at risk of harm, in that respondent left T.E. in the care of Terrence J. after alleging in the petition for an order of protection that Terrence J. was violent, had committed numerous domestic violence incidents, and had a history of battering respondent. The State dismissed the remaining counts set forth in the neglect petitions. On the basis of the stipulation, the trial court found the minors neglected.

¶ 14     On March 5, 2018, the trial court held a dispositional hearing. The trial court took judicial notice of the DCFS report filed with the court that day, which reflected that respondent was not engaged in any services. The trial court found that respondent was unfit or unable to appropriately care for, train, and discipline the minors, that it was in their best interests that DCFS retain guardianship and custody of the minors with discretion to place them with a responsible relative

or in traditional foster care, that visitation between respondent and the minors be at DCFS's discretion, and that all prior orders remain in place.

¶ 15    B. Permanency-Review Hearings and Motion to Terminate Parental Rights

¶ 16    The trial court held a permanency-review hearing approximately five months later, on August 6, 2018. At this hearing, the trial court stated that it had read the DCFS report provided to the court. With respect to respondent, the GAL informed the court that "when you don't—when you don't think that you need services, you're not going to engage in services. So that's where we are with mother." The trial court found that respondent had not made reasonable efforts during the period leading up to the hearing and maintained a goal of return home within 12 months. The trial court stated, "I wish mom would get into some services."

¶ 17    A second permanency-review hearing was held approximately six months later on January 29, 2019. The trial court took judicial notice of the DCFS report provided to the court. The GAL reported that respondent "is clearly not engaging in services" and "not signing consents so that DCFS can determine the level of any services that she might be in." The trial court concluded that respondent had not made reasonable efforts or reasonable progress during the review period and changed the permanency goal to substitute care pending court determination of termination of parental rights.

¶ 18    On March 6, 2019, the State filed motions to terminate respondent's parental rights for all four minors. The State alleged that respondent was an unfit parent on five counts: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) failure to protect the minors from conditions within the environment injurious to the minors' welfare (750 ILCS 50/1(D)(g) (West 2018)); (3) failure to make reasonable efforts to correct the conditions that caused the removal of the minors during a

nine-month period after the neglect adjudication from February 6, 2018, to November 6, 2018, and/or to April 29, 2018, to January 29, 2019 (750 ILCS 50/1(D)(m)(i) (West 2018)); (4) failure to make reasonable progress toward the return of the minors during these time periods (750 ILCS 50/1(D)(m)(ii) (West 2018)); and (5) depravity (750 ILCS 50/1(D)(i) (West 2018)). On April 22, 2019, the trial court held an arraignment on the motions to terminate parental rights.

¶ 19                              C. Unfitness Hearing

¶ 20     The unfitness phase of the termination hearing began on April 24, 2019. Initially, the trial court requested the bailiff to report for the record an earlier occurrence with respect to respondent. The bailiff stated:

> "This morning when I was out in the waiting area, I found [respondent] recording on her phone. We had talks about it on Monday which was when she was trying to take pictures here, that she could not take photo or video of the courthouse. I asked her to stop and delete whatever she had, and she became argumentative, and I informed her that if she was not going to stop recording that she needed to leave.
>
> She continued to argue with me. So the deputy escorted her out. She was told she could come back at 9:00 but she could not bring her phone back with her."

¶ 21     The trial court stated that "we've left word with the deputies downstairs that she is certainly welcomed [*sic*] to come back anytime this morning for this hearing but she cannot bring her phone." The record reflects that respondent was not present for the unfitness hearing on April 24, 2019.

¶ 22     The State called two witnesses: Cory Magnuson, a Rockford police officer, and Kendra Sicinski, a foster care caseworker with the Youth Service Bureau of Illinois Valley (YSB).

¶ 23    Officer Magnuson testified regarding his response to a 911 telephone call on November 18, 2018. He testified that respondent telephoned 911 and reported that shots were fired at the home in which the minors were living with their foster mother (the foster mother was also the minors' maternal aunt; the home was owned by respondent's grandmother). Officer Magnuson testified that he found no evidence of shots fired at the home. He also testified that respondent "told me she received a call from a neighbor advising her that there were shots fired from inside the house [in which the minors were living]." However, respondent was not able to identify the neighbor's name or telephone number. Officer Magnuson testified that he arrested respondent for misuse of 911.

¶ 24    Sicinski testified that she had been respondent's caseworker since October 2018. She explained that she maintains in her case file documents for YSB and DCFS, with whom YSB contracts. Those documents include integrated assessments and service plans. An integrated assessment "is where we meet with an integrated assessor, we discuss the case thoroughly, and they help us determine what services would benefit the parents and children." Sicinski identified People's exhibit 10 as a true and correct copy of the integrated assessment that was created for this case and that she maintained in her case file. The court admitted the integrated assessment into evidence without objection.

¶ 25    Sicinski also testified regarding the protocol for creation of a service plan. She explained: "Once the integrated assessment has been completed, we pull the recommendations from the integrated assessment to help establish what services need to be completed, what needs to be touched upon such as that." Sicinski testified that service plans are updated approximately every three to six months or as needed. Sicinski identified People's exhibits seven through nine and 18 as true and correct copies of the February 2, 2018, April 4, 2018, January 17, 2019, and April 4,

2019, service plans prepared for respondent's family and testified that she maintained the service plans in her case file. The trial court admitted the service plans into evidence without objection.

¶ 26    When questioned regarding the central issue that respondent needed to address in order to have the minors returned to her care, Sicinski testified that "[o]ne of the biggest concerns was [respondent's] mental health." Sicinski explained that respondent "did finally in January 2019 after I had asked multiple times if she was doing any services, [*sic*] who her providers were, you know, I was able to refer her to services, but she was not willing to cooperate in that she did finally provide something from Rosecrance saying that she had done an assessment and saying that at that time they did not feel she needed any services, but as part of the service plan from the integrated assessment was her being able to identify why the children came into care, how her mental health affects that." Sicinski testified that by the time she received the report and contacted Rosecrance, the consent that respondent had signed to enable her to speak with Rosecrance was set to expire the next day. Rosecrance advised that respondent could obtain services without a referral but respondent "felt she does not need to go back for these services" in light of the assessment. Sicinski testified that she met with respondent in January 2019 to address recommended services, but respondent "flat out refused."

¶ 27    In response to questioning regarding whether respondent still required the services, Sicinski testified that on one occasion, she telephoned respondent to inform her that a court date had been rescheduled, and respondent "became irate with [Sicinski] on the phone to the point I was holding the phone from my ear and the receptionist down the hall could hear her." Sicinski also described another situation, during a home visitation on February 7, 2019, where respondent became irate with her, while holding T.E., because respondent believed that Sicinski had removed a file from the living room where Sicinski was sitting. Sicinski "tried to talk her down saying that

I didn't see the packet, you know, can I help her look for it, and then before the end [of] the [] night she was calling law enforcement on me, the nonemergency line, stating to them that she wasn't even aware if I was her caseworker, even though she had seen me multiple times." Sicinski explained that her agency identification was in her office. Therefore, Sicinski showed respondent her driver's license, but respondent became irate when Sicinski covered her personal address. Respondent later left Sicinski a voicemail message in which she apologized and stated that she had located the missing file.

¶ 28    Sicinski testified that, since she had been the caseworker, respondent had not provided for any of the minors' needs, including food, clothing, or shelter. Sicinski explained that during visitation in her home, respondent cooked dinner for the minors but that she did not have money for food during the last visitation. During visits in the community, respondent relied upon the agency or foster mother to help pay for the food. Sicinski noted that respondent gave the minors Christmas gifts but that she was "not aware" of "anything else" respondent provided the minors. As to visitation, Sicinski testified, "I know [the foster parent] has had visits with her with the children, but she was supervised. I know there have been times when she had to end things with her."

¶ 29    The unfitness hearing was continued to July 18, 2019. Prior to the start of the hearing, Darcy Ellis, a police officer at the courthouse, testified with respect to her interaction with respondent earlier in the day:

> "I was sitting at my security desk; and I observed [respondent] getting off the elevator and speaking to no one but herself. I checked for an earpiece. There was not one there.

She came over to the desk where I was sitting, filled out the form, putting her name down and adding another individual's name. Uh, she wanted to look for someone to speak regarding the case [*sic*]. She approached the Public Defender's office and knocked on the door. I informed her that they're probably out to lunch. She knocked on the door again and proceeded to rub the door in a circular motion with her right hand softly (indicating), and she stepped away.

She encountered another individual in the hallway and spoke to them, did not exchange words directly with them but turned away and continued to speak to herself, apparently, under her breath and then walked off. She walked away."

¶ 30    Ellis further testified that respondent walked toward the stairwell. Ellis assumed that respondent left the building, and she did not see respondent again.

¶ 31    Additionally, the GAL informed the court that, approximately 15 minutes prior to the start of the hearing, she had been advised by her assistant that respondent had visited her office and "indicated that she had some papers for DCFS." Upon being advised of DCFS's location, respondent left the building. The assistant state's attorney and counsel for respondent contacted DCFS and informed the court that they were told respondent had not been there that day. Counsel for respondent moved to continue the hearing; the trial court denied the motion. The record reflects that respondent was not present for the continued unfitness hearing on July 18, 2019.

¶ 32    Upon questioning by the GAL, the foster mother testified that there were occasions where respondent was inappropriate with the minors and that most recently, "a visit ended up at the police station because we gave her a ride and her—she became combative. She became agitated. Um, so I just drove to the police station here, and we talked to an officer, and she politely then exited the vehicle." On another occasion, the foster mother testified, "the police had to come, um, but that

was because she had grandiose thinking of what was going on inside the home. So the police had to ask her to leave then."

¶ 33    Additional exhibits were admitted into evidence, including indicated packets and respondent's medical records as well as certified copies of convictions, orders of protection, and prior cases with respect to the minors. The trial court also took judicial notice of various documents, including the temporary shelter-care orders, neglect petitions, adjudication and parentage orders, dispositional order, supplemental protective orders, and permanency-review orders.

¶ 34    On November 27, 2019, the trial court issued its decision on unfitness, finding that the State met its burden of proving respondent unfit by clear and convincing evidence on all five counts of the motions to terminate respondent's parental rights. Respondent was present. The trial court found:

> "According to the indicated packet and other documentary evidence, [respondent], according to the records, has been diagnosed in the past to have paranoid schizophrenia. The records show that she was not taking meds, refuses to take meds for that condition, and also has been found to smoke crack.
>
> The records show that [respondent] was found to hit the children with such things as a belt, a hanger, a shoe, or an extension cord. Specifically, the two minors that have been hit according to the records were [D.E. and D.Z.E.]. As to [A.E.], she also has a mental health diagnosis and has been known to have behavior issues. The indicated packet shows that [respondent] was indicated for an environment injurious, and up to now that condition has not been remedied as the children have not been returned home to [respondent]."

¶ 35    The trial court stated that the August 6, 2018, and January 29, 2019, permanency-review orders show that respondent was found not to have made reasonable efforts or reasonable progress. The trial court noted respondent's three Class A misdemeanor convictions for attempted forgery, resisting a peace officer, and battery. The trial court also noted Officer Magnuson's testimony regarding respondent's arrest in November 2018 for misuse of 911 and found that the arrest "was concerning and related to the minors as the stability of [respondent's] mental health."

¶ 36    The trial court further found:

"[Respondent] suffers from mental health problems, and that is why the minors came into custody. In January 2019, she was not willing to cooperate with services. A Rosecrance assessment was provided by [respondent] showing no services were needed; however, the consent to speak to Rosecrance had expired, and [respondent] refused to give further consent. According to the caseworker, this prevented the mother from getting services she needed. [Respondent] has said to her multiple times that she does not need any services. In communicating with the worker, [respondent] yells in phone calls, accused the worker of taking a packet of information, and at one time got right into her face holding [T.E.] at the time. Due to [respondent's] argumentativeness to her, this worker quit going into [respondent's] home."

¶ 37    The trial court pointed out that, as of October 2018, respondent was receiving two hours of weekly supervised visits in her home. However, when the permanency goal was changed, the frequency of the visits was reduced to two times per month and no longer took place in respondent's home due to respondent's behavior. The trial court noted the foster mother's agreement that the visits remained supervised for the minors' safety. The trial court also noted that respondent was referred to parenting services but never attended, was not involved in the minors'

educational or medical appointments, and provided no food, clothing, or shelter to the minors, except for cooking dinner for the minors when the supervised visits were in respondent's home.

¶ 38    The trial court ruled that "[a]s to the environment injurious, that is covered in the—I'm sorry; in the indicated packet that was placed into evidence." As to the depravity count, the trial court found that respondent is "unable to conform [her] behavior to societal norms, which is the issues brought up by the case law as to depravity." Moreover, the trial court noted, the foster mother testified "as to an incident in June of 2019 when the foster mother and the minors drove [respondent] to the police station due to safety concerns with [respondent]." Accordingly, the trial court found respondent unfit on all five counts in the State's motions to terminate parental rights.

¶ 39    The case proceeded to the best-interests hearing that day. The trial court determined that the State established by a preponderance of the evidence that it was in the minors' best interests that respondent's parental rights be terminated.

¶ 40    Respondent timely appealed. She challenges the finding of unfitness; she does not challenge the trial court's finding on best interests.

¶ 41                              II.  ANALYSIS

¶ 42    The Juvenile Court Act of 1987 (Act) sets forth a bifurcated procedure for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). Under this procedure, the State must make a threshold showing of parental unfitness by clear and convincing evidence. 705 ILCS 405/2-29(2), (4) (West 2018); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds a parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights would serve the minors' best interests. *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990); *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004). We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19.

A decision is against the manifest weight of the evidence only if the decision is unreasonable, arbitrary, or not based on the evidence, or if the opposite result is clearly apparent. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 43 Respondent challenges the sufficiency of the evidence to support the trial court's determination as to unfitness on grounds that the majority of the evidence upon which the trial court relied was inadmissible hearsay. She further argues that the remaining, admissible evidence was insufficient to sustain the State's burden of proof. Respondent also argues that she was denied the effective assistance of counsel and that her due process rights were violated because the trial judge who presided over the proceedings leading up to the filing of the motions to terminate her parental rights also presided over the unfitness hearing. We address each argument in turn.

¶ 44                                    A. Unfitness

¶ 45 Respondent's challenge to the unfitness finding centers on her argument that the trial court erred in admitting the DCFS service plans and integrated assessment as business records because the State failed to lay a proper foundation for their admission. Initially, we note that respondent did not object at the fitness hearing to admission of the service plans and integrated assessment. Thus, respondent has forfeited on appeal any challenge to their admission. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41 ("Generally, an issue that was not objected to during trial *** is forfeited on appeal."). Respondent nevertheless contends that we should consider this issue under the plain-error doctrine.

¶ 46 Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." The plain-error doctrine is a limited and narrow exception to the forfeiture rule. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The doctrine allows a reviewing court to consider

an unpreserved error where either (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused, regardless of the seriousness of the error or (2) a clear or obvious error occurs and the error is so serious that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before we determine whether plain error occurred, however, we must first determine whether any error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). This requires a substantive review of the issues raised on appeal. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). If clear or obvious error did not occur, no plain-error analysis is necessary. *People v. Wright*, 2017 IL 119561, ¶ 87; *Walker*, 232 Ill. 2d at 124-25. Here, we need not engage in a plain-error analysis, as we find that no error occurred with respect to the admission of the service plans or the integrated assessment.

¶ 47    Termination proceedings under the Act employ the general rules of civil practice and the provisions of the Code of Civil Procedure unless the Act specifically governs the procedure at issue. 705 ILCS 405/2-18(1) (West 2018); *In re S.J.*, 407 Ill. App. 3d 63, 69 (2011) (finding it proper to apply rules of evidence under the Act to a hearing involving the termination of parental rights). The Act specifically provides for the admission of business records into evidence if the statutory foundational requirements are satisfied. 705 ILCS 405/2-18(4)(a) (West 2018); *In re A.B.*, 308 Ill. App. 3d 227, 234-35 (1999). Specifically, section 2-18(4)(a) of the Act provides:

> "(4)(a) Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was

made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. *** All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/2-18(4)(a) (West 2018).

¶ 48 Respondent acknowledges the general admissibility of documents such as services plans and integrated assessments pursuant to section 2-18(4)(a) but argues that the State failed to lay a proper foundation for their admission in this case. To satisfy the foundational requirements for the business-record exception provided in the Act, the State was required to establish that the documents were made (1) as a memorandum or record of the event, (2) in the regular course of business, and (3) at the time of the event or within a reasonable time thereafter. 705 ILCS 405/2-18(4)(a) (West 2018); *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 13; *A.B.*, 308 Ill. App. 3d at 235. Respondent's challenge is to the third element. She contends that the State failed to establish that the entries in the service plans and integrated assessment were made at the time of the event or within a reasonable time thereafter. We disagree.

¶ 49 Respondent frames her argument as a challenge to deficiencies in Sicinski's testimony. She contends that the State did not ask, and Sicinski did not testify, that the entries in the service plans and integrated assessment were made at the time of the event or within a reasonable time thereafter. According to respondent, even if the State had asked the foundational question, Sicinski could not have testified that the entries in the integrated assessment and first two service plans were made at or near the time of the event because she was not assigned to the case until October 2018. We disagree.

¶ 50    Initially, we note that the author of the writing does not need to testify or be shown to be unavailable; anyone familiar with the business and its procedures may testify about how the writing was prepared. *J.Y.*, 2011 IL App (3d) 100727, ¶ 13; *A.B.*, 308 Ill. App. 3d at 235. Thus, the length of Sicinski's assignment to the case was not a barrier to the use of her testimony to establish the foundation for admission of the service plans and integrated assessment as business records. Sicinski testified that she had been respondent's caseworker since October 2018. She explained that she maintained the service plans and integrated assessment in her case file. Sicinski further testified regarding the creation of the integrated assessment and its role in setting forth the services that would benefit the parents and children. She explained that the recommendations set forth in the integrated assessment formed the basis for the goals set forth in the service plans. She also explained the protocol for creation of a service plan. She identified People's exhibits seven through 10 and 18 as true and correct copies of the service plans and integrated assessment prepared for this case and maintained in her case file.

¶ 51    Regardless, respondent maintains, Sicinski did not testify that the entries in the service plans and integrated assessment were made at the time of the event or within a reasonable time thereafter. According to respondent, this rendered the service plans and integrated assessment inadmissible because the service plans covered the entire period of the case and reflect no dates in the records themselves from which it could be determined that the records were made at or within a reasonable time after each act or occurrence.

¶ 52    A review of the documents refutes respondent's argument. As Sicinski testified, the integrated assessment was created to set forth the recommended services that form the goals set forth in the service plans. The integrated assessment and each "interview activity" set forth in the integrated assessment was dated. In turn, each service plan was dated and identified various tasks

and task-related "action steps" for each participant to complete during the relevant review period. Each plan also listed establishment and evaluation dates for each task, a start date and evaluation date for each "action step," an evaluation narrative for each task and "action step," and a summary of the family's progress since the last review.

¶ 53    Accordingly, each service plan builds upon the previous plan by detailing the extent, if any, of respondent's participation and progress with the tasks and "action steps" identified therein over the period of time preceding the date of the plan. This constitutes sufficient evidence from which it could be determined that the service plans were made at or within a reasonable time after each act or occurrence recorded in the service plans. See *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 61 (citing *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 40 (finding that passage in letter specifying that the minor " 'has been showing a lot of aggressive behavior *lately*' " suggested that the described events occurred within a recent time period) (emphasis in original); *Kenneth J.*, 352 Ill. App. 3d 967, 983 (2004) (finding that the requirements for admission of "Parenting Assessment Report" under section 18(4)(a) of the Act were satisfied where evidence at hearing showed that document was prepared in the regular course of the agency's business and the document "was clearly made contemporaneously with the events the Report recorded"); *A.B.*, 308 Ill. App. 3d at 235-36 (holding that service plans were properly admitted under section 18(4)(a) of the Act where each witness testified that the plans were prepared in the regular course of business and were made contemporaneously with the events they purported to record)). Accordingly, we reject respondent's claim that the State failed to lay a proper foundation for admission of the service plans and integrated assessment at the termination hearing.

¶ 54    Respondent nonetheless argues that the service plans contain multiples levels of hearsay that are not transformed into admissible evidence merely because the hearsay appears in an

otherwise admissible report. She argues that hearsay statements contained in the service plans require the application of another hearsay exception before they may be considered. See Illinois Rule of Evidence 805 (eff. Jan. 1, 2011) ("[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"). According to respondent, the State failed to establish that each item of multilevel hearsay within the service plans met the foundational requirements for a business record and thus the multilevel hearsay within the service plans was improperly admitted.

¶ 55    We rejected a similar argument in *Z.J.*, 2020 IL App (2d) 190824, ¶¶ 65-72. The lack of knowledge of the maker of the documents at issue is, in accordance with the statute, a matter of weight rather than admissibility. *Id.* ¶ 67 (citing 705 ILCS 405/2-18(4)(a) (West 2018) ("All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility.")). The legislature deemed it proper to admit DCFS records and the information contained therein, as long as the information was made of record in the regular course of the agency's business and at the time of the event or within a reasonable time thereafter. *Id.* It is only logical that such records are admissible and may be considered, because assessing a parent's compliance with service plans is included in a determination of whether the parent has made reasonable progress or has maintained a reasonable degree of interests, concern, or responsibility as to a minor's welfare. *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001) (reasonable progress); *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (reasonable degree of interest, concern, or responsibility)). Accordingly, the trial court could properly consider the service plans and attribute to them whatever weight they were due.

¶ 56    Having rejected respondent's argument that the trial court based its determination upon inadmissible hearsay, respondent presents no argument, and our review of the record demonstrates no basis upon which to hold that the trial court's finding of unfitness was against the manifest weight of the evidence.

¶ 57                    B. Ineffective Assistance of Counsel

¶ 58    Respondent contends that the order terminating her parental rights should be reversed because she received ineffective assistance of counsel. Although there is no constitutional right to counsel in proceedings pursuant to the Act, a parent has a statutory right to counsel in a proceeding to terminate his or her parental rights. 705 ILCS 405/1-5(1) (West 2018); *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 41. To adjudicate a parent's claim of ineffective assistance of counsel in a proceeding to terminate parental rights, we apply the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42. Thus, to prevail on a claim of ineffective assistance of counsel, a parent must show that counsel's performance fell below an objective standard of reasonableness and that, but for the error, a reasonable probability exists that the result of the proceeding would have been different. *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42 (citing *Strickland*, 466 U.S. at 687-88, 694). Both prongs of the *Strickland* test must be satisfied; thus, the failure to satisfy either one of the prongs precludes a finding of ineffective assistance of counsel. *Id.*

¶ 59    Respondent initially contends that trial counsel was ineffective for failing to object to the testimony of Sicinski and the admission of the service plans and integrated assessment. However, as previously discussed, there was no basis upon which to object to Sicinski's testimony, and the service plans and integrated assessment were properly admitted under the Act. Thus, the failure to object was not objectively unreasonable, as any objection would not have been successful. See

*People v. Wilson*, 164 Ill. 2d 436, 454 (1994) (failing to interpose a futile objection is not ineffectiveness); *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010) (same)

¶ 60    Respondent also argues that trial counsel was ineffective for failing to object to the testimony of Officer Magnuson. According to respondent, the State presented no foundation for Officer Magnuson's testimony regarding respondent's arrest for misuse of 911. However, respondent makes no argument with respect to how the result of the proceeding would have been different had this isolated testimony been excluded. Indeed, in addition to citing Officer Magnuson's testimony, the trial court relied upon respondent's misdemeanor convictions for attempted forgery, resisting a peace officer, and battery in rendering its unfitness determination. Based upon our review of the record, respondent cannot establish prejudice from the admission of Officer Magnuson's testimony even if respondent could demonstrate that counsel's failure to object to the testimony fell below an objective standard of reasonableness.

¶ 61    As a final matter, respondent contends that trial counsel was ineffective for failing to object "to the court relying on its own prior rulings at permanency hearings." In issuing its determination as to unfitness, the trial court stated that the August 6, 2018, and January 29, 2019, permanency-review orders show that respondent was found not to have made reasonable efforts or reasonable progress. According to respondent, a finding at a permanency-review hearing is not relevant to a trial on unfitness because the State's burden of proof at such a hearing is clear and convincing evidence whereas there is no burden of proof at a permanency-review hearing.

¶ 62    However, the grounds for finding unfitness are independent; thus, a reviewing court may affirm an assessment of parental unfitness if the evidence supports it on any one of the grounds alleged. *Z.J.*, 2020 IL App (2d) 190824, ¶ 81 (citing *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30). A review of the trial court's ruling reflects that the trial court's statements regarding the

permanency-review orders were made in reference to its findings that respondent failed to make reasonable efforts to correct the conditions that caused the removal of the minors and failed to make reasonable progress toward the return of the minors—relating to Counts III and IV. But the trial court found that the State met its burden of proving respondent unfit by clear and convincing evidence on all five counts alleged in the State's motions to terminate respondent's parental rights. Thus, even if trial counsel's failure to object to the trial court's remarks fell below an objective standard of reasonableness, respondent has failed to show a reasonable probability that the result of the proceeding would have been different. Accordingly, we hold that respondent failed to establish ineffective assistance of counsel.

¶ 63                                    C. Judicial Bias

¶ 64    Respondent contends that she was denied due process because the judge who presided over the unfitness phase of the termination hearing also presided over the proceedings leading up to the termination hearing. Respondent argues that we should adopt a rule that the judge presiding over termination proceedings should not be the judge who has presided over the hearings leading up to the termination where that judge has ordered a change of the permanency goal to termination of parental rights. We rejected a similar argument in *Z.J.*, 2020 IL App (2d) 190824, ¶¶ 82-85.

¶ 65    A trial judge is presumed to consider only admissible evidence and disregard inadmissible evidence. *Id.* ¶ 85 (citing *People v. Naylor*, 229 Ill. 2d 584, 603 (2008)). This presumption is rebutted only " 'if it affirmatively appears from the record that improper evidence was considered by the court.' " *Id.* (quoting *People v. Dobbs*, 353 Ill. App. 3d 817, 824 (2004)). Further, Illinois Supreme Court Rule 903 (eff. March 8, 2016) provides that "[w]henever possible and appropriate, all child custody and allocation of parental responsibilities proceedings relating to an individual child shall be conducted by a single judge."

¶ 66    Thus, our supreme court has expressed a preference for the same judge to hear all proceedings involving child custody and the division of parental responsibilities. *Z.J.*, 2020 IL App (2d) 190824, ¶ 85. Indeed, this is similar to the supreme court's proclamation in the criminal context that "the same judge who presided over the defendant's trial should hear his post-conviction petition, unless it is shown that the defendant would be substantially prejudiced." *Id.* (citing *People v. Hall*, 157 Ill. 2d 324, 331 (1993)). The *per se* rule advocated by respondent would be contrary to the supreme court's admonition that "[t]o conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made." *Id.* (citing *People v. Vance*, 76 Ill. 2d 171, 179 (1979)). As in *Z.J*, we decline to announce such a rule.

¶ 67                                   III. CONCLUSION

¶ 68    For the reasons set forth above, we affirm the judgment of the circuit court of Winnebago County.

¶ 69    Affirmed.