**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210546-U

Order filed March 4, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* N.W, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-21-0546 |
| | ) | Circuit No. 18-JA-172 |
| v. | ) | |
| | ) | |
| NAKIA W., | ) | Honorable |
| | ) | Paula A. Gomora, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Holdridge and Hauptman concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) Counsel's express statement declining to object to admission of service plans foreclosed plain error review on appeal pursuant to the invited error doctrine; (2) respondent forfeited review of claim that caseworker's testimony amounted to hearsay; and (3) trial court's determination that respondent was unfit was not contrary to the manifest weight of the evidence.

¶ 2     Respondent, Nakia W., appeals following the termination of her parental rights. She argues that the trial court erred in admitting certain evidence at the unfitness portion of

termination proceedings. She also contends that the court's determination that she was unfit was contrary to the manifest weight of the evidence. We affirm.

¶ 3                                                 I. BACKGROUND

¶ 4         On October 22, 2018, the State filed a petition for adjudication of wardship in which it alleged that N.W. (born May 13, 2016) was a neglected minor. In support of that allegation, the State asserted that respondent, N.W.'s mother, had left N.W. with an unrelated person without a care plan. Subsequently, the unrelated person was unable to contact respondent. Further, the State asserted that respondent had failed to cooperate with a Department of Child and Family Services (DCFS) investigator and with a DCFS care plan for N.W. Following a hearing, the court placed N.W. in shelter care.

¶ 5         The court found N.W. to be neglected on February 4, 2019. One month later, following a dispositional hearing, the court found respondent unfit and adjudicated N.W. a ward of the court. In the written order, the court found that respondent had "not been compliant with services and visitation" and had been uncooperative with DCFS.

¶ 6         Between July 22, 2019, and July 15, 2021, the court conducted five permanency review hearings. Following four of those five hearings, the trial court found that respondent had not made reasonable progress toward the goal of N.W.'s return to the home.

¶ 7         On July 20, 2021, the State filed a petition to terminate respondent's parental rights. In the petition, the State alleged three grounds on which respondent was unfit to have a child: (1) she failed to maintain a reasonable degree of interest, concern, and responsibility as to N.W.'s welfare; (2) she failed to make reasonable efforts to correct the conditions which were the basis for N.W.'s removal; and (3) she failed to make reasonable progress toward N.W.'s return in the nine-month period between September 1, 2020, and June 30, 2021.

¶ 8        A hearing on the State's termination petition commenced on October 22, 2021. Respondent was not present at the hearing. Salvador Arias testified that he was the assigned caseworker from September 2020 through March 2021. Arias generated a service plan for respondent that required her to complete substance abuse and mental health assessments and follow any resulting recommendations. She was also required to attend parenting class and complete a domestic violence program. The service plan also contemplated visitation. Arias testified that respondent had completed some services prior to his involvement in the case, including the domestic violence program and parenting classes. Further parenting coaching was still required.

¶ 9        After Arias described the requirements set forth in the service plan, the following exchange ensued:

> "[THE STATE]: Mr. Arias, I'm showing you what I have marked as State's Exhibit No. 1
>
> Do you recognize this document?
>
> A: Yes, that is the service plan that I did.
>
> Q: Okay. And the plan date is December 17 of 2020; is that right?
>
> A: That's correct.
>
> Q: Okay. Could you please just briefly thumb through this service plan and look up when you are finished to let me know that that is a true and accurate copy of your service plan?
>
> A: Sure. It looks – it looks like what I did.

The State then requested that the service plan be admitted into evidence. Counsel for respondent stated: "No objection." The court admitted the evidence but noted that it would only be

considered "for the purpose of showing what the services were and what the ratings were." The court noted that it would not consider any hearsay statements contained within, absent testimony from Arias.

¶ 10    Arias testified that respondent was "unsatisfactory" in the completion of the service plan. He also observed that, throughout his time on the case, respondent had never reached out to him to inquire as to N.W.'s well-being or to otherwise receive updates on N.W. She never sent any gifts or correspondence to be forwarded to N.W.

¶ 11    Upon questioning from the trial court, Arias testified that visitation between respondent and N.W. "was very inconsistent and sometimes only lasted a couple minutes at a time." Because visitation was supervised by the foster parent, Arias explained, visitation was possible any time respondent and the foster parent were available. Respondent and N.W. "would do *** phone calls and FaceTimes and stuff like that and periodically they would meet in person."

¶ 12    Yaritza Cruz testified that she was the assigned caseworker beginning in March 2021. When Cruz was assigned to the case, respondent had yet to follow through on the treatment recommendations following her 2019 substance abuse assessment. Respondent was also to receive weekly counseling sessions, but Cruz testified that the agency had not received documentation of that service since late 2019. Respondent also failed to participate in the recommended parenting coaching.

¶ 13    Cruz testified that respondent was inconsistent in visiting with N.W. Respondent would call the foster parent approximately once a month, but never made accommodations to see N.W. Cruz and her supervisor suspended visitation in April 2021 because respondent "didn't do drops." Cruz also observed that respondent never reached out to her to inquire as to N.W.'s well-

4

being. Nor did respondent attend any of N.W.'s routine medical appointments. During the nine-month period in question, respondent did not complete her recommended services.

¶ 14      Cruz generated a service plan in June 2021. After reviewing a copy provided by the State, Cruz agreed that it was a true and correct copy of the service plan. The State requested that it be admitted into evidence as State's exhibit 2. When the court asked if there was any objection, counsel for respondent replied: "No."

¶ 15      The service plans admitted into evidence indicated that DCFS originally became involved in the case after respondent had made repeated attempts to leave N.W. in the care of others. Respondent had refused to participate in a safety plan for N.W. She tested positive in October 2018 for benzodiazepines and THC. Respondent "refused to partake in substance abuse treatment and has refused to get sober from using THC." Both reports listed respondent's residence and employment status as unknown.

¶ 16      The service plan dated December 17, 2020, generated by Arias, indicated that in the preceding six months, respondent had failed to attend her random drug screenings and had not completed substance abuse treatment "due to her unwillingness to stop smoking marijuana." Respondent had asked the caseworker to "leave her alone." The plan also indicated that N.W. had been in the foster care of a relative since July 2020.[1]

¶ 17      The service plan indicated that respondent had successfully participated in an integrated assessment as of February 11, 2019. Respondent had made satisfactory progress in participating in individual therapy, having commenced counseling on May 20, 2020. The plan also showed that respondent completed parenting classes on July 19, 2019.  The service plan indicated that

_____

[1]Cruz would testify at the subsequent best interest hearing that the foster parent was N.W.'s maternal aunt, respondent's sister.

5

respondent had completed a domestic violence education program, though the date of that completion was not included.

¶ 18    Respondent completed a mental health evaluation on October 23, 2019, and was subsequently recommended for "weekly sessions." The service place indicated that the most recent documentation of participation was from November 16, 2019. Respondent refused to speak with Arias about the mental health action step and had not signed a consent for release of documentation of her progress.

¶ 19    Respondent completed a substance abuse evaluation on October 22, 2019, but had not completed any recommended services. Respondent missed five requested drug screenings in the six-month period preceding the service plan.

¶ 20    As to visitation, the plan noted that visitation was taking place via phone and video conferencing due to the COVID-19 pandemic. The plan indicated that respondent "engages with [N.W.] as well as she can considering the quarantine circumstances." The plan rated respondent unsatisfactory in her visitation, as she had "missed visitation in the month of November."

¶ 21    Overall, the service plan rated respondent's progress as unsatisfactory. Completion of substance abuse treatment and mental health counseling, and documentation thereof, were among the continuing needs listed in the plan.

¶ 22    The service plan of June 2, 2021, generated by Cruz, described respondent as having made "minimal progress" in the six-month reporting period. Specifically, the plan indicated that respondent "has not completed her substance abuse treatment due to her unwillingness to stop smoking marijuana, engaged in her mental health recommended treatment after the screening, or attend[ed] random drug drops." The narrative evaluation continued: "When caseworker attempted to speak with [respondent] about her engagement in services or willingness to do so,

6

[respondent] informed caseworker to leave her alone if the agency was not giving back her children." The service plan listed six dates on which respondent had failed to appear for a drug screening, though five of those dates had appeared on the previous service plan.

¶ 23    As to visitation, the service plan stated that respondent was "not engaged in visitation and was not appropriately engaging in visitation prior to visitation stopping." The plan also described respondent's visitation as "sporadic" prior to the complete cessation of visitation. Finally, the plan showed that Cruz had "suspended visits because it had been sporadic and inconsistent."

¶ 24    The June service plan rated respondent's overall progress as unsatisfactory. It documented the same shortcomings with respect to substance abuse treatment, counseling, drug testing, and certain documentation as had the December service plan.

¶ 25    The trial court found that the State had proved by clear and convincing evidence that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to N.W.'s welfare. The court noted that respondent's visitation with N.W. had been "sporadic at best," despite the fact that visitation had been allowed to be "frequent and liberal." The court also found that the State had proven by clear and convincing evidence that respondent had failed to make reasonable progress toward the return of N.W. in the nine-month period in question. Finally, the court found that the State had not sufficiently proven that respondent had failed to make reasonable efforts to correct the conditions that were the basis for N.W.'s removal, noting that there had been no testimony concerning the original basis for removal.

¶ 26    After proceeding directly to the best interest portion of the termination proceedings, the court found that it was in N.W.'s best interest that respondent's parental rights be terminated.

¶ 27                              II. ANALYSIS

¶ 28        Respondent raises three arguments on appeal. First, she argues that the trial court erred in admitting the service plans into evidence absent proper foundational testimony. Second, she contends that the court erred in allowing Cruz to testify regarding information to which she had no personal knowledge, namely, events predating her involvement in the case. Finally, respondent asserts that the trial court's finding that the State proved her unfit on the two stated grounds was contrary to the manifest weight of the evidence.

¶ 29                                    A. Service Plans

¶ 30        Section 2-18 of the Juvenile Court Act of 1987 (Act) holds that, in any hearing under that Act, any business record relating to a minor subject to the proceedings will be admissible "if the court finds that the document was made in the regular course of the *** agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter." 705 ILCS 405/18-2(4)(a) (West 2020).

> "For a writing to be admissible as a business record under section 2-18(4)(a), the proponent must establish a foundation showing that the writing was (1) made as a memorandum or record of the event, (2) made in the ordinary course of business, and (3) made at the time of the event or within a reasonable time thereafter." *In re A.B.*, 308 Ill. App. 3d 227, 235 (1999).

¶ 31        Respondent contends that no such foundation was laid for the admission of the service plans in this case. She concedes that counsel did not object to the admission of those service plans, but argues that this court should consider the issue under the rubric of plain error.

¶ 32        The State does not argue that sufficient foundation was provided for the admission of the service plans. Instead, the State asserts that the doctrine of invited error precludes respondent

8

from presently raising this issue after counsel below expressly declined to object to the plans' admission.

¶ 33    "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel. [Citation.] Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill.2d 210, 217 (2004).

> "To allow a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal would offend notions of fair play and encourage defendants to become duplicitous. [Citation.] It would also deprive the State of the opportunity to cure the alleged defect." *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17.

"[A] defendant's invitation or agreement to the procedure later challenged on appeal 'goes beyond mere waiver.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). Accordingly, a determination that an error was invited forecloses plain error review. *Harding*, 2012 IL App (2d) 101011, ¶¶ 2, 22.

¶ 34    In the instant case, counsel for respondent explicitly stated that he had no objection to the admission of the service plans into evidence. Respondent is therefore estopped from now claiming that the admission of those plans was error. See *In re Detention of Swope*, 213 Ill.2d at 217; *People v. Farley*, 2021 IL App (3d) 190735-U, ¶ 42 (counsel's express refusal to object created invited error).

¶ 35    Application of the invited error doctrine is particularly appropriate here, given the apparent ease with which the State could have cured the defect in question. Both Arias and Cruz testified that they were the caseworkers assigned to respondent's case, they authored their

9

respective service plans, and the services plans contemplated the events of the preceding six-month period. Had counsel for respondent objected on foundational grounds, it seems likely that Arias and Cruz would have testified that the service plans were compiled in the ordinary course of business. To not invoke the invited error doctrine in this context would incentivize attorneys to *not* object to such technical, easily curable omissions, to provide a potential path to relief on appeal.

¶ 36        Furthermore, even if we were to not find the doctrine of invited error forecloses plain error review, we would find that respondent has waived any such argument on appeal. In her brief, respondent asserts only the reviewing court may apply plain error review in the context of neglect and termination proceedings. From there, however respondent makes no argument and provides no legal citation that might explain how or why the instant issue rises to the level of plain error. Respondent does not explain whether the error is reversible under the first prong or the second prong of the plain error doctrine; in fact, respondent makes no reference to either prong. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (describing the first and second prongs of the plain error test). It is well settled that "bare contentions in the absence of argument or citation of authority do not merit consideration on appeal and are deemed waived." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are waived[.]"). Respondent has therefore waived any contention of plain error.

¶ 37                                B. Caseworkers Testimony

¶ 38        Respondent next argues that "the trial court erred by allowing the testimony of the caseworkers regarding the case file." It seems that respondent's argument is comprised of two distinct claims of error. First, she argues that the court erred in allowing Arias and Cruz to testify

10

regarding the contents of their respective service plans "absent a proper foundation." Respondent points to the caseworkers' testimony that respondent was rated unsatisfactory in each plan as an example of such improper testimony.

¶ 39 This portion of respondent's argument appears to be based on the well settled axiom that "[a] witness is not permitted to testify as to the contents of the document or provide a summary thereof; the document 'speaks for itself.' " M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 825 (7th ed.1999). That particular rule, however, is a corollary to the business records exception—the hearsay exception upon which section 18-2(4)(a) of the Act is based. *In re A.B.*, 308 Ill. App. 3d at 236. Accordingly, the axiom from Graham's is inapplicable, as the caseworkers' testimony regarding respondent's progress was not hearsay. Rather, Arias and Cruz were the assigned caseworkers at the times the respective service plans were authored; it was Arias and Cruz who assigned the rating to which they each testified, based on their personal knowledge of respondent's progress.

¶ 40 To that point, the second portion of respondent's argument is that Cruz *did* testify to events in the case of which she no direct personal knowledge. Respondent provides a single example of such evidence, the following exchange at the end of Cruz's testimony:

> "[THE STATE:] So, Miss Cruz, I know you have been the caseworker since March of [2021], but during the time frame from approximately September of 2020 through June 30th of this year being 2021, can you adequately tell the Court whether [respondent] and [N.W.'s father] have completed all of their recommended services?
>
> [CRUZ:] No, they did not."

Respondent notes that Cruz became the assigned caseworker in March 2021, such that any knowledge of respondent's performance before that time would have been, at most, indirect.

¶ 41    Initially, respondent broadly asserts that this issue should be subject to plain error review. However, once again, she provides no argument or legal citation in support the notion that this passage from Cruz's testimony actually amounts to plain error. Thus, respondent's plain error argument must be deemed waived. See *Obert*, 253 Ill. App. 3d at 682. In turn, appellate review of the underlying claim has been forfeited by respondent's failure to preserve it below. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 42    In any event, it is not immediately apparent that Cruz testified to information of which she did not have personal knowledge. As the assigned caseworker beginning in March 2021, there is no dispute that Cruz would have had direct personal knowledge of the goals respondent needed to complete. The simple fact that those goals were still outstanding at the time Cruz took over the case would have made clear to Cruz that respondent had not previously completed them.

¶ 43    Even assuming, *arguendo*, that the single, four-word answer from Cruz amounts to a "clear, obvious, and plain error," (see *People v. Mitok*, 2018 IL App (3d) 160743, ¶ 8 (describing the first step of plain error analysis)), that error would not present grounds for relief under either prong of plain error. First, as detailed below (*infra* ¶¶ 49-55), the evidence at the termination hearing was decidedly *not* closely balanced. See *Thompson*, 238 Ill. 2d at 613. Second, we are unaware of any case suggesting that a basic hearsay error rises to the level of structural error.[2] See *id*. Thus, even if respondent had not waived the issue, we would not find that reversible plain error had been committed.

---

[2]In fact, our supreme court has held that even where the improper admission of hearsay evidence amounts to a confrontation clause violation, the error is still not structural. *People v. Patterson*, 217 Ill. 2d 407, 424 (2005).

12

¶ 44                           C. Manifest Weight of the Evidence

¶ 45          Finally, respondent contends that the trial court's determination that she was unfit was contrary to the manifest weight of the evidence.

¶ 46          Before terminating parental rights under the Act, the trial court must find by clear and convincing evidence that the parent is unfit under the definitions provided in the Adoption Act (750 ILCS 50/1 (West 2020)). 705 ILCS 405/2-29(2) (West 2020). The grounds for unfitness under the Adoption Act include the three alleged by the State in this case:

> "(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare [and]
>
> * * *
>
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(b), (m) (West 2020).

We note that of those three charged grounds, the trial court made an express finding that the State had failed to prove the allegation under subsection (m)(i), as no testimony had been offered establishing the original basis for which N.W. was removed.

¶ 47          The trial court's determination that the State has demonstrated a parent's unfitness by clear and convincing evidence will not be disturbed on review unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417 (2001). "A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly the

13

proper result." *Id.* Finally, a finding that any one allegation has been proven by clear and convincing evidence is sufficient to sustain a parental unfitness finding on review. *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001).

¶ 48    In the instant case, the court's finding that respondent failed to make reasonable progress toward the goal of N.W. returning to home over the nine-month period in question was not contrary to the manifest weight of the evidence.

¶ 49    The service plans, in conjunction with the testimony of Arias and Cruz, showed that respondent essentially made *no* such progress between September 2020 and June 2021. When Arias took over as caseworker, respondent's goals included participating in substance abuse treatment, continuing mental health treatment, and parenting coaching. Arias's service plan indicated that respondent had been rated unsatisfactory in each of those goals, and the service plan generated six months later was no different. Respondent made no progress toward those goals in the nine-month period. Additionally, respondent continued to fail to appear for drug screenings throughout the period.

¶ 50    To be sure, the record shows that respondent did successfully complete some goals over the life of the case. Respondent participated in an integrated assessment, completed a domestic violence program and parenting classes, and had commenced counseling. However, with the exception of the domestic violence program—for which no date of completion was provided— all of this progress occurred prior to the nine-month period in question. Indeed, most of it occurred in 2019, *well* before September 2020.

¶ 51    With respect to visitation, respondent demonstrated *regression* over the course of the nine-month period. Respondent failed to complete any visitation in November 2020, and Arias noted that her visitations were "very inconsistent and sometimes only lasted a couple minutes at

14

a time." Still, Arias credited respondent with doing "as well as she can considering the quarantine circumstances." In April 2021, visitation was suspended due to respondent's noncompliance with the service plan.[3] Moreover, as the trial court observed, visitation was allowed to be "frequent and liberal," with respondent allowed to visit with N.W. any time her schedule and the foster parent's—respondent's sister—allowed. Despite this fact, respondent's visitation was inconsistent and sporadic.

¶ 52    Respondent argues that much of her lack of progress in the nine months in question can be attributed to the COVID-19 pandemic, as it was "raging across the [s]tate during the entire relevant nine-month period." Specifically, she notes that the electronic visitation made necessary by the pandemic was especially difficult given that N.W. was four or five years old at the time. Also, respondent urges that her failure to submit to drug screenings is of lessened significance because "[t]o what extent that drug testing facilities and treatment providers remained open during the first year of the pandemic remains unclear."

¶ 53    Respondent's argument is entirely speculative. The record contains no evidence that respondent suffered any difficulties in communicating with or visiting N.W. through telephone or video conferencing. In fact, Arias indicated that in-person visitation had not been completely foreclosed. See *supra* ¶ 11. Further, even if telephonic communication with N.W. was challenging, the unfettered nature of the visitation would have allowed to respondent to engage in more frequent, short visits—an option to which she did not avail herself. Moreover, there was no evidence that drug testing facilities were closed at any point from September 2020 through

_____

[3]While Cruz testified that visitation was suspended because of respondent's refusal to submit to drug screening, her service plan indicated that it was her unreliable participation in visitation that led to the suspension. In either event, it is clear that it was respondent's conduct in contravention of the service plan that resulted in suspension of visitation.

June 2021. With respect to substance abuse treatment, the service plans indicated that respondent "refused" treatment and "refused to" and was "unwilling[] to" stop smoking marijuana. This evidence undermines that notion that respondent failed to complete treatment only because of the purported closure of treatment centers.

¶ 54    In the case of *In re J.O.*, 2021 IL App (3d) 210248, this court reversed the trial court's unfitness determination where eight months of the nine-month period in question were the first eight months of the COVID-19 pandemic. That case contrasts markedly with this one. In *J.O.*, the record was replete with evidence indicating precisely how the pandemic had impeded the mother's progress. See *id*. ¶¶ 9-28. This included actual testimony from the caseworker describing the difficulties inherent in conducting video visitation with two- and three-year-old children. *Id*. ¶ 23. Moreover, we observed the particular difficulties inherent in navigating "the lockdown phase of the pandemic." *Id*. ¶ 60. Here, of course, the period in question ranged from six months to 15 months after the pandemic began. Absent any evidence of the COVID-19 pandemic's impact on respondent's progress, we are unable to indulge her speculation.

¶ 55    Between September 2020 and June 2021, respondent made no measurable progress toward the goal of N.W. returning to home. Accordingly, we cannot find that the trial court's determination that she failed to make reasonable progress was contrary to the manifest weight of the evidence. Because that determination was sufficient to a finding of unfitness, we need not address the additional basis on which the court found respondent unfit. *In re D.H.*, 323 Ill. App. 3d at 9.

¶ 56                              III. CONCLUSION

¶ 57    The judgment of the circuit court of Will County is affirmed.

¶ 58    Affirmed.

16